**N. H. Phillips, Appellee, v. Brownell Improvement Company, Appellant.**

## Gen. No. 17,891.

1. INSTRUCTIONS—*when error not cured.* Error in giving instructions which are peremptory and direct a verdict, but do not embrace all the elements necessary to recovery, is not cured by the giving of other instructions.

2. MASTER AND SERVANT—*when instructions directing verdict erroneous.* Where the assumption of risk relied on by defendant

is not negatived in each count of the declaration, it is reversible error to give instructions which direct a verdict and refer to the declaration in its entirety, but do not mention the defense of assumption of risk.

Appeal from the Superior Court of Cook county; the Hon. GEORGE W. PATTON, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1911. Reversed and remanded. Opinion filed March 6, 1913.

F. J. CANTY, HARRY M. McCONNELL and GEORGE W. MILLER, for appellant.

AMMEN, STREYCKMANS & JOYNER, EDWARD MAHER and BERNHARDT FRANK, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

This is an action for damages for personal injuries sustained by appellee, a carpenter, hereinafter referred to as plaintiff, while in the employ of appellant, hereinafter referred to as defendant. At the time of the accident, October 23, 1908, plaintiff was working on a scaffold underneath a bridge in close proximity to two wires heavily charged with electricity, and, his right arm probably coming in contact with one of the wires, he received burns and fell to the ground, sustaining other injuries by reason of the fall. A verdict for $4,500 was returned by the jury in his favor, judgment was entered against defendant for that amount and costs, and this appeal is prosecuted to reverse that judgment.

The facts are, substantially, as follows: The defendant was engaged in constructing concrete abutments and concrete flooring in this and other bridges of the Gary and Western Railway Company (hereinafter called the railroad). This bridge was erected to enable the railroad to pass over the right of way, tracks, and trolley wires of the Chicago, Lake Shore and South Bend Railway Company (hereinafter called

the interurban). The bridge "ran a little northeast to southwest," and the interurban "ran almost due east and west" under the bridge. The bridge was about 60 feet long and between 28 and 30 feet wide from girder to girder. There were two girders, set on edge, 60 to 65 feet long and 8 feet deep, which rested upon the concrete abutments at each end. Between and connecting these two girders were I-beams, which were each about 18 or 19 inches up and down from flange to flange and which were between 12 and 13 inches apart from web to web. False flooring, consisting of planks, had been placed, by plaintiff and other workmen, about ten days before the accident, lengthwise on the under side of the upper flange of these I-beams and braced with boards and sticks resting on the upper side of the lower flange of these I-beams. These braces were put in about 30 or 32 inches apart. Over the steel and false flooring a concrete floor had been laid, and after the concrete had sufficiently hardened it was necessary to remove the false flooring. Portions of this false flooring had been removed, prior to the accident, by plaintiff and a fellow workman named Emery, from a swinging scaffold, up to about four feet from the single track of the interurban underneath the bridge. Six or seven feet east of the bridge and on the south side of said single track of the interurban there was a wooden trolley pole, and about 166 feet from it, west of the bridge, there was a similar pole. From each of these poles an iron arm extended out over the interurban track, which arms supported a one-half inch "messenger cable." This cable had a sag in it between the poles, and underneath it was a one-half inch copper trolley wire, which was pulled straight, and which was connected with or hung from the messenger cable by means of pieces of galvanized iron, called "clips," about 12 feet apart. The clips were of varying lengths—those nearest the poles being 23 inches long, others being shorter, according to the sag in the cable. The clip half way between the

poles was the shortest, being 5 inches long. There was no insulation between the clips and either the trolley wire or the messenger cable, so that all carried the same current, about 6,600 volts, when the interurban was being operated. The fact that there was no insulation between these wires could be seen from the ground. Plaintiff testified: "Street cars were running along that street car track. * * * It was a trolley line. I saw that and knew it. * * * I saw those wires there. * * * Both of them were naked so far as I know. * * * I could stand on the ground and see those wires and their condition." There was a porcelain insulator at the end of each arm where the messenger cable was attached, which also could be seen from the ground. Both the cable and the trolley wire ran under the bridge and there was no connection between either of them and the bridge.

Plaintiff was about fifty years of age, and had been employed by defendant as a carpenter for about two and a half years, working on bridges near Gary, Indiana. At one time he had worked for the Chicago City Railway Company as a motorman, running electric cars operated by means of trolley wires. On the afternoon of the accident Carrick, the foreman in charge of the work, told plaintiff and Emery to get the "carpenter's horses" and tear out the remaining false flooring. Carrick said: "You two go up and tear out that false flooring while Mr. Kimball and I watch for the cars." Two wooden horses about 16 feet high were procured and each placed across the interurban track about 16 feet apart, and on these horses a 16-foot plank was laid, south of the trolley wire. Plaintiff and Emery got up on this plank and began to remove some of the false flooring. Before doing so, plaintiff asked Carrick if there was time to take the boards out before a car came along. Carrick consulted a time table and said there was "close to an hour." The plank was about 5 feet below the lower

surface of the steel work of the bridge.  After taking out two boards of the false flooring, they slid the plank along on the top of the horses, nearer to the center of the track, and both men stood on the plank facing each other and were from about 5 to 8 inches south of the cable and trolley wires.  Plaintiff's right side was towards the wires.  The cable or top wire was about even with plaintiff's hip, and the trolley wire where he was standing was from 8 to 10 inches below the cable wire.  Emery had taken out his end of the third board and plaintiff was engaged in hammering out the braces at his end of the board with his right hand, steadying himself by holding on to one of the I-beams of the bridge above with his left hand.  While plaintiff was so engaged, some part of his body came in contact with one or both of the wires and a "flash came from his left hand."  No witness seemed to be able to say exactly how he came in contact with the wire or wires.  Plaintiff testified:

"I knew at that time that there had to be an electrical current in one of those wires at least, in order to operate those cars.  *  *  *  I knew that the trolley wire was charged.  I have heard that copper, steel and iron could become charged with electricity.  *  *  * I supposed at that time that the lower wire was the one that was charged with electricity.  *  *  *  I had been holding on to the I-beam with my hand and had struck this brace a couple of licks before I lost consciousness.  *  *  *  The last I remember I struck a glancing blow.  I was standing up pounding this brace, when the board loosened at the bottom, my arm slipped  *  *  *  and came down in contact with that cable.  *  *  *  I did not see my arm touch the wire. I felt nothing.  I know my arm hit the wire because the burn on my arm shows it.  I couldn't have struck the trolley wire; that is an impossibility.  I am reasoning that I must have hit the cable.  *  *  *  While I had ahold of the steel I-beam with my left hand I watched myself to see that I did not come in contact with the trolley wire, because I presumed that the trolley wire was dangerous."

Immediately after the flash, plaintiff reeled and fell from the plank to the ground—a distance of about 16 feet—where there were rocks and timbers. When his fellow-workmen reached him he was unconscious. He was taken first to Gary, where a physician attended him, and afterwards to his home, where he received further medical attention. He did not recover consciousness until about 10 o'clock in the evening. It was found that he was burned on the right forearm between the elbow and wrist, also on the palm of his left hand; he sustained severe bruises and was otherwise injured. He. was confined to his bed for about one month, and was unable to walk without the aid of a cane for about eight months.

Counsel for defendant urge that the judgment is erroneous because (1) plaintiff assumed the risk, (2) defendant was not guilty of negligence, (3) the court erred in refusing to admit in evidence a written statement signed by a witness for plaintiff and which was offered for the purpose of impeachment, and (4) the court erred in giving and refusing to give certain instructions.

After careful examination of the record and the briefs and arguments of the respective counsel, we have reached the conclusion that there should be a new trial of this case, because of the giving by the court to the jury of certain instructions, offered by plaintiff, which we think constituted prejudicial error. We will refrain from a discussion of the other points made by defendant's counsel.

Instructions Nos. 4 and 11, offered by plaintiff and given were as follows:

"4. And the court further instructs the jury that if they believe from the evidence that the plaintiff was injured, as alleged in plaintiff's declaration, while he was in the exercise of ordinary care, and if they further believe that his injury was caused by the negligence of the defendant, as charged in the declaration, then, under the law, it becomes the duty of the jury to find a verdict in favor of the plaintiff."

"11. And you are further instructed, as a matter of law, that if you find from the evidence that the defendant has been guilty of negligence, as alleged in the declaration, and that such negligence caused the injury to the plaintiff, complained of in the declaration, and that before and at the time of such injury the plaintiff was in the exercise of ordinary care for his personal safety, then your verdict should be for the plaintiff."

The point is made that these instructions ignore the question of assumption of the risk by plaintiff, which was one of the chief defenses in this case. Each instruction is peremptory and directs a verdict. Instructions of this kind should embrace all the elements necessary to a recovery. Herdman-Harrison Milling Co. v. Spehr, 145 Ill. 329; Illinois Terra Cotta Lumber Co. v. Hanley, 214 Ill. 243; Montgomery Coal Co. v. Barringer, 218 Ill. 327, 336. And the error is not cured by the giving of other instructions. Montgomery Coal Co. v. Barringer, *supra;* Cromer v. Borders Coal Co., 246 Ill. 451. The case went to the jury on all three counts of the declaration. We fail to find in the first count any allegations negativing, either expressly or by implication, the assumption of risk by plaintiff. Nor do we find any allegations in the second and third counts expressly negativing such assumption of risk, and it is questionable whether either count does so by implication. The instructions referred to the declaration in its entirety, and, in the absence of a negation of the assumption of risk by plaintiff in each and every count, the giving of the instructions constituted reversible error. Swengel v. Illinois T. V. Coal Co., 154 Ill. App. 409, 415; Cantwell v. Harding, 249 Ill. 354, 357; Illinois Terra Cotta Lumber Co. v. Hanley, *supra;* Cromer v. Borders Coal Co., *supra.*

We are also of the opinion that the court erred, in view of the evidence in this case, in giving to the jury instruction No. 8, offered by plaintiff. Illinois Cent. R. Co. v. Fitzpatrick, 227 Ill. 478, 482; Browne v. Siegel,

Cooper & Co., 191 Ill. 226, 233; Klofski v. Railroad Supply Co., 235 Ill. 146, 156; Kath v. East St. L. Suburban Ry. Co., 232 Ill. 126, 132.

For the reasons indicated the judgment of the Superior Court is reversed and the cause remanded.

*Reversed and remanded.*